# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 05-3423/3724

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Robert Edward Maloney, | * | |
| | * | |
| Appellant/Cross-Appellee. | * | |

_____

Submitted: May 16, 2006
Filed: October 27, 2006

_____

Before LOKEN, Chief Judge, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Robert Edward Maloney was convicted by a jury of unlawful possession of a firearm as a previously convicted felon, and he was sentenced to 180 months' imprisonment. Maloney appeals his conviction, and the government appeals the sentence. We affirm the conviction but vacate the sentence and remand for resentencing.

I.

Maloney was charged with unlawful possession of a firearm as a previously convicted felon, *see* 18 U.S.C. § 922(g)(1), and with unlawful possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5861, 5871. At trial, the government presented evidence that on September 4, 2004, the St. Cloud Police Department received a complaint that a motorist in a blue, four-door Chevrolet with South Dakota plates and a cracked windshield had pointed a handgun at another driver. Sergeant James Steve testified that he went to the area and soon encountered a blue Chevrolet with South Dakota plates and a cracked windshield. According to Sergeant Steve, while he was driving behind the vehicle, he saw the driver and the passenger of the Chevrolet making "quick movements," "side to side, up and down," which were "not ordinary for a normal person," and which caused him to believe that "there [wa]s something going on in the vehicle." (T. Tr. at 36).

Sergeant Steve testified that he decided not to stop the vehicle by himself, but that after another officer reached the area, he turned on his emergency lights and attempted to stop the car. The driver of the Chevrolet did not respond to his lights, so Steve turned on his siren, but the other car accelerated. Steve testified that he pursued the Chevrolet for several blocks until the driver "drove the vehicle right into the woods and fled from the vehicle." (T. Tr. at 43).

Concerned that the driver might be armed, Sergeant Steve did not immediately pursue the driver into the woods on foot. As other officers arrived, Steve instructed them to seal off the perimeter of the wooded area into which the suspect had fled. Later, one of the perimeter officers apprehended an individual in the woods, and Steve identified him as the person who had been driving the blue Chevrolet. The individual gave his name as "Joseph McMahon," but he was later identified as Robert Maloney.

-2-

Officers inventoried the contents of the blue Chevrolet and found several items in the back seat, including a back pack, a black canvas bag, a green canvas bag, and miscellaneous articles of clothing. The green canvas bag was partially open, and the barrel of a "pellet-type pump-up rifle" was sticking out of the bag. When officers opened the black canvas bag located in the back seat, they found a sawed-off shotgun.

The government also presented a tape and transcript of a police interview with Maloney. Maloney said in the interview that he did not own a car and that he had borrowed the Chevrolet from a friend earlier that same day. Maloney stated that he had thrown his clothes into the rear of the vehicle and had seen a bag with a pellet rifle on the back seat. He said that when some girls drove past him in another vehicle and gave him a "crazy" look, he grabbed the pellet gun and held it in his hands. Maloney explained that when police officers later attempted to effect a traffic stop, he "had the pellet gun still sittin' there," and he "didn't wanna pull over." When asked the reason why he ran from the police, Maloney said, "[o]bviously there was things in the car." Police did not ask Maloney about the sawed-off shotgun during the interview.

At the close of the government's case, Maloney moved for a judgment of acquittal, arguing that the evidence was insufficient to sustain a conviction. The district court denied the motion, and the jury then found Maloney guilty of unlawful possession of a firearm as a previously convicted felon, but acquitted him of unlawfully possessing an unregistered firearm.

A presentence investigation report ("PSR") was prepared by the United States Probation Office. The PSR calculated a criminal history category of VI based on 15 criminal history points. The PSR also noted that Maloney's criminal history included convictions for second-degree assault, simple robbery, and terroristic threats, and concluded that Maloney was both a career offender under USSG § 4B1.1 and an armed career criminal under 18 U.S.C. § 924(e). The PSR calculated an offense level of 37, which produced an advisory guideline range of 360 months' to life

imprisonment. In addition, the PSR described Maloney's turbulent upbringing and lengthy history of substance abuse.

At sentencing, the court acknowledged Maloney's "bad record" and the fact that he had "appropriately" been classified as an armed career criminal and career offender, and the court adopted the PSR's findings and advisory guideline range. Nonetheless, the court determined that the appropriate sentence, considering all of the factors in 18 U.S.C. § 3553(a), was the statutory minimum sentence of 180 months. The court believed that "180 months in prison is a long period of time in anybody's book," (S. Tr. at 14), and that a sentence of that length would promote respect for the law, provide just punishment, and protect the public. The court also thought the sentence would deter crimes by others, since it was unlikely anyone would be "more deterred by a 360 month sentence than a 180 month sentence." (S. Tr. at 13). With respect to Maloney in particular, the court noted his "troubled childhood," "mother who left early," and "father who, from all reports, was abusive," which "explain[ed] perhaps some of what he was doing," and also observed that Maloney would benefit from "educational or vocational training, psychiatric counseling, alcohol and drug abuse training while he's in prison." (S. Tr. at 13). Ultimately, the court believed that "if this defendant has any chance or the system has any chance to cure him of his past misdeeds and his ways, it will not occur if he's given a . . . 360 month sentence or anything more than 180 months." (S. Tr. at 12).

## II.

Maloney challenges the sufficiency of the evidence against him, arguing that no reasonable juror could have believed that he knowingly possessed the sawed-off shotgun. When we review a claim that the evidence was insufficient to sustain a conviction, we view the evidence in the light most favorable to the prosecution, accepting all reasonable inferences that may be drawn in favor of the verdict, and we

will affirm unless no reasonable juror could have found the defendant guilty. *United States v. Walker*, 393 F.3d 842, 846 (8th Cir.), *cert. denied*, 126 S. Ct. 463 (2005).

To convict Maloney of unlawful possession of a firearm as a previously convicted felon, the government was required to prove beyond a reasonable doubt that Maloney knowingly possessed a firearm. *Id*. at 846. It is undisputed that the pellet gun protruding from one bag in the back seat of the Chevrolet was not a "firearm" within the meaning of the statute, so the conviction turns on whether a reasonable jury could find that Maloney knowingly possessed the shotgun found in the black bag in the back seat of the car. Maloney argues that the evidence was insufficient to support this finding.

"Possession" can be either actual or constructive, and either sole or joint. *Id.* at 847. A person may be in constructive possession of a firearm when he has "dominion and control" over the firearm itself, or the premises in which the firearm was located. *Id.* By driving the blue Chevrolet in which the firearm was found, Maloney clearly exercised "dominion or control" over the sawed-off shotgun. *United States v. Hiebert*, 30 F.3d 1005, 1008-09 (8th Cir. 1994). Maloney argues, however, that the government nonetheless failed prove that he "knowingly" possessed the weapon. In support of this argument, Maloney notes that he did not own the Chevrolet, no fingerprints were found on the gun, and there was no testimony from any witness indicating that the shotgun belonged to him or that he knew about its presence in the vehicle.

Knowledge may be proved by circumstantial evidence, and the government did present evidence from which the jury could have inferred that Maloney was aware of the items in the back seat area of the car, including the firearm. Sergeant Steve testified that when he was following the Chevrolet, he saw quick and unusual movements by the driver of the car, thus permitting an inference that the driver may have been trying to hide an object in the back seat. The shotgun was found in the

same area of the car with Maloney's clothing and with the pellet gun, which Maloney admitted carrying earlier in the day. Maloney continually sought to evade law enforcement, first by failing to stop, then by exiting his vehicle and fleeing into the woods, and later by giving a false name to police. He admitted knowing that there were "things" in the car that led him to flee. (Gov't Ex. 16 at 3).

Maloney argues that the evidence shows only that he knew about the pellet gun, but not the sawed-off shotgun in the closed bag. He contends that the government's key evidence – his flight and his admission that there were "things" in the car – can be explained by his concern that he would be charged with brandishing the pellet gun at another driver who reported the incident to police. A jury might have drawn this inference, but the presence of one possible "innocent" explanation for the government's evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilt beyond a reasonable doubt. *United States v. Ellefson*, 419 F.3d 859, 863 (8th Cir. 2005). Here, the jury reasonably could conclude that Maloney's familiarity with other objects in the back seat area, his admission about "things" in the car, and his efforts to avoid apprehension demonstrated knowledge of the firearm in the vehicle. We conclude that the evidence was sufficient to sustain Maloney's conviction.

III.

In its cross-appeal, the government argues that Maloney's 180-month sentence is unreasonable with regard to the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 261 (2005). The government contends that the sentence, which varied substantially from the advisory guideline range of 360 months' to life imprisonment, was not justified by the individualized circumstances of the case and lies outside the range of reasonable options available to the district court. Our review of a district court's variance from the guideline range at sentencing is akin to abuse of discretion review, but our ultimate task is to determine whether the sentence

is unreasonable with regard to 18 U.S.C. § 3553(a). *United States v. Ture*, 450 F.3d 352, 356 (8th Cir. 2006).

In fashioning a sentence under the system announced in *Booker*, a district court should continue to calculate the applicable advisory guideline range. The Supreme Court pointedly rejected the suggestion that a sentencing judge "has the same discretion 'he possessed before the [Sentencing Reform] Act was passed,'" *Booker*, 543 U.S. at 264 (quoting *id*. at 305 (Scalia, J., dissenting in part)), and emphasized that a district court must "consult" the guidelines and "take them into account when sentencing." *Id*. at 264; *see United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir.), *cert denied*, 126 S. Ct. 276 (2005). We have noted that "[t]he Guidelines were fashioned taking the other § 3553(a) factors into account and are the product of years of careful study," and for that reason, a sentence within the advisory range is presumptively reasonable. *United States v. Lazenby*, 439 F.3d 928, 932 (8th Cir. 2006). After *Booker*, however, a district court has flexibility to vary from that range "to individualize sentences where necessary," and to tailor the sentence in light of statutory concerns other than the advisory guidelines. *Booker*, 543 U.S. at 245-46, 264-65.

Our appellate review under the *Booker* regime is not designed to provide the *same* uniformity that Congress originally sought to secure with the mandatory sentencing guidelines. *Id*. at 264. The Supreme Court made clear, however, that application of a "reasonableness standard" was intended to further the statutory objectives of achieving "honesty," "uniformity," and "proportionality" in sentencing, and to help in avoiding "excessive sentencing disparities." *Id*. In light of that guidance, and because it is impractical for appellate review to assist in avoiding "excessive sentencing disparities" unless there is a benchmark from which to measure potential disparities, we have concluded that "[t]he further the district court varies from the presumptively reasonable guideline range, the more compelling the justification based on the [§] 3553(a) factors must be." *United States v. Bryant*, 446

F.3d 1317, 1319 (8th Cir. 2006). "[A]bsent exceptional facts," imposition of a sentence that is "dramatically lower than that recommended by the guidelines is an abuse of the district court's discretion." *United States v. Goody*, 442 F.3d 1132, 1134 (8th Cir. 2006).

A "dramatic" variance cannot be defined precisely, but we have found it instructive to consider the actual sentence as a percentage of the advisory sentence, or the number of offense levels traversed by a variance. The offense-level approach seems more in keeping with our assigned role to further the objectives of the Sentencing Reform Act, because the guideline system established by the Act was designed to adjust sentences incrementally by offense level, rather than by percentages. *Cf. United States v. Saenz,* 428 F.3d 1159, 1162 (8th Cir. 2005) (noting the Sentencing Commission has concluded that most adjustments for aggravating or mitigating circumstances should be in an amount of two, three, or four offense levels). Evaluating the sentence imposed as a percentage of the advisory sentence can be useful in some instances, *e.g.*, *United States v. Likens*, No. 05-3917, 2006 WL 2707648, at * 2 (Sept. 22, 2006); *United States v. Bradford*, 447 F.3d 1026, 1028 (8th Cir. 2006), but it is helpful to bear in mind that a downward variance of "fifty percent" is more "dramatic" within the context of the advisory guideline system when the advisory sentence is 360 months' imprisonment (and the variance amounts to seven offense levels) than when the advisory sentence is eight months (and the variance is only two offense levels). *See also United States v. Wallace*, 458 F.3d 606, 613 (7th Cir. 2006) ("The percentage reduction will always seem larger if the overall number is a small one: 24 months less than a possible sentence of 25 months would be a 96% reduction; 24 months less than a possible sentence of 240 months would be a 10% reduction").

In this case, the sentence of 180 months' imprisonment was fifty percent of the bottom of the advisory guideline range of 360 months' to life imprisonment, and it constituted a variance of seven offense levels. Under any measure, this is a substantial

deviation from the advice of the Sentencing Commission. The district court thought that despite the magnitude of the variance, a term of 15 years' incarceration was sufficient to afford adequate deterrence, to provide just punishment, and to promote respect for the law. Accepting those propositions for the sake of argument, we believe the district court's analysis nonetheless gave insufficient weight to the statutory objective of avoiding unwarranted sentence disparities. 18 U.S.C. § 3553(a)(6).

Congress specified that "career offenders" should be sentenced at or near the statutory *maximum*, 28 U.S.C. § 994(h), which in this case is life imprisonment, and the advisory guidelines thus recommend substantial punishments for offenders in those categories. USSG § 4B1.1. The primary reason given by the district court for sentencing Maloney to the statutory *minimum* of 180 months' imprisonment was Maloney's youthful age of 22 years, and the court's view that a longer sentence would undermine his chances at rehabilitation. The court stated that if Maloney were 35 or 40 years old, the court would "be sending him off to closer to the 360 months," because the court would have serious questions about whether a defendant at that age could be rehabilitated. (S. Tr. at 14).

The sentencing guidelines provide that "[a]ge (including youth) is not ordinarily relevant in determining whether a departure is warranted." USSG § 5H1.1. This policy statement is no longer mandatory after *Booker*, but it is still "advice" that the sentencing court must consider and take into account when sentencing. *See* 18 U.S.C. § 3553(a)(5); *United States v. Lee*, 454 F.3d 836, 839 (8th Cir. 2006). In our view, the district court's decision to vary from the recommendation of the Sentencing Commission, at the specific direction of Congress, that the sentence for a career offender be at or near the statutory maximum of life imprisonment, to impose instead the statutory minimum of 180 months' imprisonment, based almost entirely on Maloney's relative youth, is unreasonable with regard to § 3553(a). Relative youth is a factor that may apply to many career offenders, and it is unlikely that district courts uniformly will adopt the view of the district court in this case. *See United*

*States v. Bradford*, 447 F.3d 1026, 1029 (8th Cir. 2006) ("It is not reasonable to expect that other similarly situated defendants are receiving similar extraordinary reductions."). If we were to conclude that youth justifies a sentence at or near the statutory minimum rather than at or near the statutory maximum, the potential for excessive sentence disparities would be substantial. Career offenders could then receive polar opposite sentences depending either on their age (young versus middle-aged), or on whether a given district judge agreed with the sentencing philosophy of the district court in this case concerning rehabilitation and deterrence for youthful career offenders.

To the extent that prior lenient treatment by state courts was an individualized circumstance on which the district court relied in this case, the presence of this additional factor does not alleviate our concern about excessive sentence disparities. Some district judges believe prior leniency is a circumstance warranting a reduction in the recommended sentence for career offenders, *e.g.*, *United States v. Senior*, 935 F.2d 149, 151 (8th Cir. 1991), while others view it as a factor justifying enhanced punishment in a later case. *E.g.*, *United States v. Shannon*, 414 F.3d 921, 924 (8th Cir. 2005); *United States v. Lang*, 898 F.2d 1378, 1380 (8th Cir. 1990). We have said that both views may justify some degree of variation in sentencing, but again, it is evident that approval of the district court's analysis in this case, and the degree of variance adopted, has great potential to result in excessive sentencing disparities, as other district judges apply their own personal sentencing philosophies concerning prior lenient treatment.

We reiterate that after *Booker*, the purpose of our appellate review is not to attain the same uniformity in sentencing that Congress sought to achieve through the Sentencing Reform Act. But it is worth noting that in this appeal, as in most others that we have considered after *Booker*, *see United States v. McDonald*, 461 F.3d 948, 956 n.7 (8th Cir. 2006), the government does not seek uniformity consistent with the pre-*Booker* framework, which prohibited even modest departures based on

discouraged factors such as youth, unless they were present to an exceptional degree. *E.g.*, *United States v. Caldwell*, 219 F.3d 1186, 1192-93 (10th Cir. 2000). This case, rather, involves a very large variance that runs counter to specific guidance of the Congress concerning sentences for career offenders and against the advice of the Sentencing Commission on the principal factor involved – the defendant's relative youth. Consistent with our responsibility to further the objectives of the Sentencing Reform Act by maintaining some level of uniformity in sentencing, and to assist in avoiding *excessive* sentencing disparities, we conclude that the statutory minimum sentence of 180 months' imprisonment is unreasonable with regard to § 3553(a).

\*      \*      \*

For these reasons, we affirm Maloney's conviction, but vacate his sentence and remand for resentencing.

_____