# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3516

_____

United States of America,          *
                                   *
        Appellant,                 *
                                   *   Appeal from the United States
    v.                             *   District Court for the District of
                                   *   Minnesota.
Nagappan Mylappan Chettiar,        *
                                   *
        Appellee.                  *

_____

Submitted: April 3, 2007
Filed: September 5, 2007

_____

Before BYE, BRIGHT, and RILEY, Circuit Judges.

_____

BYE, Circuit Judge.

The United States appeals the sentence imposed by the district court after Nagappan Mylappan Chettiar pleaded guilty to knowingly hiring ten or more unlawful aliens in violation of 8 U.S.C. § 1324(a)(3)(A). The Government argues the district court imposed an unreasonable sentence when it varied downward pursuant to 18 U.S.C. § 3553(a) from the sentence range advised by the U.S. Sentencing Guidelines (U.S.S.G. or Guidelines). We remand for resentencing.

# I

Chettiar, a citizen of India and a lawful permanent resident of the United States, was born on April 20, 1962, in Tamil Nadu, India. His father died when he was four and his mother died when he was six or seven. He quit school at age eight and, at age ten, left his family to look for a job, moved to Bombay, and sent money from his earnings back to his family. In 1986, he immigrated to the United States and lived on the streets of New York City until he found employment at a restaurant. He later lived in Maryland and Illinois where he worked as a cook. He returned to India for a short time in 1992 to marry his current wife. His wife later immigrated to the United States. Chettiar and his wife have two children, both of minority age.

In 1998, Chettiar moved to Minnesota. In 1999, he opened a restaurant in a Minneapolis suburb. In 2004, he opened a second restaurant in Tempe, Arizona. Prior to his arrest, Chettiar estimated he earned approximately $4,500 each month between his two cafes and his wife earned approximately $4,000 per month. He had a net worth of approximately a million dollars. Until his arrest for hiring undocumented workers, he continued to send money to his three siblings who reside in India.

In June 2004, federal immigration officials received an anonymous letter accusing Chettiar of employing undocumented workers in Minnesota and treating them like slaves. Searches of Chettiar's cafes and houses revealed Chettiar was housing a number of undocumented workers at a duplex he owns in Minnesota and in an apartment in Arizona. Ultimately, immigration officials determined Chettiar employed nine undocumented workers in Minnesota and two in Arizona. Six of these workers were detained as material witnesses by order of the district court for about three months each. All told, undocumented workers comprised 85% of Chettiar's workforce. Chettiar's records showed these workers worked on average twelve hour days, six days a week, for wages less than the federal minimum wage rate. The business records suggested Chettiar failed to pay about $75,000 in wages that would

have otherwise been required under federal law and failed to pay about $150,000 in wage taxes, although these numbers were debated and the exact numbers were not determined at sentencing.

Without exception, the workers characterized Chettiar as a good employer who treated them with respect. The workers apparently ate at the cafes for free and paid no rent to Chettiar but some paid for their housing utility costs. The employees reported being able to take work breaks and one reported receiving pay when he was sick and unable to work. Some of the employees worked in Minnesota and Arizona and Chettiar paid for their travel between the two locations. Some of the workers reported Chettiar offered to file labor certifications or other petitions to allow them to have legal status in the United States. One employee reported Chettiar was paying an immigration attorney to regularize his immigration status. While there is some dispute as to whether employees took long afternoon breaks and to what extent they took vacations (some apparently traveled back to Mexico to visit family), the district court ultimately accepted the United States' pay chart, which shows the workers were paid $800-$1600 in cash every two weeks. The workers reported receiving raises in their pay. One worker indicated Chettiar paid for his dental care. Some of the workers reported they were allowed to work fewer hours if they chose and were free to do as they wished during their time off.

In March 2006, pursuant to a plea agreement, the United States filed a felony information charging Chettiar with one count of knowingly hiring ten or more unlawful aliens in violation of 8 U.S.C. § 1324(a)(3)(A). For his part of the plea agreement, Chettiar agreed to, among other things, (1) plead guilty to the charge in the information, (2) pay the costs of prosecution (estimated at $4,000), (3) forfeit real estate with an equity value of approximately $250,000 and assist the Government in conveying clear title to the properties, (4) forfeit $16,147 in cash and 49,500 in Rupees (a cash value of about $1,000), (5) surrender his permanent resident status and voluntarily depart the United States after serving his sentence, (6) waive the right to

file any additional pretrial motions,[1] and (7) waive his right to appeal his guilt or sentence (unless the district court imposed a sentence in excess of a year and a day) or to petition for a writ of habeas corpus under 28 U.S.C. § 2255. In exchange for his plea, the Government agreed to dismiss the indictment, seek a sentence of one year and one day, not pursue charges against Chettiar's wife, and not seek forfeiture of any of Chettiar's other property.

The parties agreed Chettiar's base offense level was twelve and that he should receive a two-level downward adjustment for acceptance of responsibility. The parties disagreed whether Chettiar should receive a three-level upward specific offense adjustment for harboring between six and twenty-four unlawful aliens pursuant to U.S.S.G. § 2L1.1(b)(2)(A) (2005). Therefore, the parties agreed Chettiar's Guidelines' offense level was either a thirteen (twelve to eighteen months imprisonment under Zone C with no probation possible) or a ten (six to twelve months imprisonment under Zone B with the possibility of probation for some or all of the term).[2]

At sentencing, after an evidentiary hearing at which the government presented testimony and exhibits concerning the § 3553(a) factors, the district court determined the three-level upward adjustment for harboring unlawful aliens applied and set Chettiar's offense level at level thirteen. Chettiar's counsel then asked the district court to impose a sentence of home detention in lieu of prison in consideration of

---

[1]He also agreed to withdraw his pending pretrial motions.

[2]The Guidelines sentencing table contains a zonal overlay which identifies when and how imprisonment may be substituted for no confinement or some period of confinement other than imprisonment (e.g., intermittent confinement, halfway houses, or home detention). Zone A guideline ranges are those with a minimum of zero months, Zone B offenses have a minimum of at least one but not more than six months, Zone C offenses have a minimum of eight, nine, or ten months, and Zone D offenses are all offenses having a minimum of twelve months or more. U.S.S.G. App. C, Vol. I, amend. 462 (Nov. 1, 1992).

Chettiar's background, the challenges he faced, and in light of how similar crimes had been punished in the district. After adjourning the proceedings for fifteen minutes to converse with a representative of the U.S. Probation Office, the district court then stated:

> This is a case—type of case that has not come before this Court in recent years and so trying to figure . . . the appropriate sentence, the Court has labored long and hard to think about what would be appropriate.
>
> . . . . What I have to do is to sentence you appropriately on what your conduct was and I think—I am hoping that I am fashioning a sentence that will be appropriate. First off is to send a signal to you that the type of activity that you were involved in was clearly wrong. It goes against everything that our country stands for. Our country is one of immigrants.
>
> . . . . You have come to this country; and although you did not become a citizen, you were able to get the appropriate documentation to work, to own businesses, and to become a millionaire.
>
> Unfortunately, you did that on the back of individuals that were not supposed to be in this country or did not have the documentation to be in this country. You exploited those individuals, exploited them for your benefit, and that goes against the grain of what our country stands for, what our laws stand for and you have to be punished for that.
>
> My punishment is, I think, appropriate within the guideline range because you have some very significant things going for you. Number one, none of these individuals that you harbored were either sexually or physically abused by you. If that was the case, I would throw the book at you. At most you exploited individuals for your own benefit. And when we traffic in human beings, I think it's despicable.

Sent. Tr. 55-57. The district court imposed a sentence of "time served," with a two-year period of supervised release that included a total of twelve months confinement

without work release privileges: three months in a half-way house and nine months in home detention. The district court instructed:

> The conditions of your home confinement are going to be strict. You are going to be on a bracelet, ankle bracelet. You are going to pay for that and your movements will be monitored and you will be able to go out of the house only on the direction of the probation officer who will be supervising your supervised release. Any violations of that will send you to prison.

Id. at 59-60. The district court also ordered Chettiar to comply with the provisions of the plea agreement, including the requirement he give up his permanent resident status and voluntarily depart from the United States upon completion of his sentence. The district court concluded:

> I know that you are going to walk out of this courtroom thinking, Why am I being punished? I supplied a good place for these people to live, I fed them. Nothing I can do can change that other than to tell you that any time someone exploits and traffics and harbors human beings, they are the lowest of human beings.

Id. 60-61. The district court identified the following reasons for imposing a sentence outside the advisory Guidelines:

> the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)
>
> to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))
>
> to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))

to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))

The district court also issued a separate "Statement of Reasons for Imposing Sentence" in which it stated: "The Court has considered the relevant Guidelines, the applicable statutory sentence that applies in this case, together with the statutory factors enumerated above, and finds that a sentence of time served, together with the conditions of supervised release, accomplishes the statutory goals of sentencing."

The United States contends in its appeal the sentence is unreasonable for three reasons: (1) there were no "exceptional facts" to warrant the downward variance, which the Government characterizes as "dramatic" and "extraordinary"; (2) the district court failed to state specific reasons for its sentence; and (3) the district court gave significant weight to two improper and irrelevant factors.

## II

In sentencing a defendant, the district court should follow three steps: (1) calculate the advisory Guidelines range; (2) consider whether any departure is warranted under the Guidelines; and (3) consider the sentencing factors enumerated in 18 U.S.C. § 3553(a) and impose a reasonable sentence. United States v. Lee, 454 F.3d 836, 838 (8th Cir. 2006). "[This court] review[s] the reasonableness of a sentence for an abuse of discretion." Id. "[A]n abuse of discretion may occur when (1) a court fails to consider a relevant factor that should have received significant weight; (2) a court gives significant weight to an improper or irrelevant factor; or (3) a court considers only the appropriate factors but in weighing those factors commits a 'clear error of judgment.'" United States v. Haack, 403 F.3d 997, 1004 (8th Cir. 2005) (quoting Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984)). "'The further the district court varies from the presumptively reasonable guideline range, the more compelling the justification based on the 3553(a) factors must be.' An extraordinary reduction must be supported by extraordinary circumstances." United

States v. Gonzalez-Alvarado, 477 F.3d 648, 650 (8th Cir. 2007) (quoting United States v. Bryant, 446 F.3d 1317, 1319 (8th Cir. 2006)).

A

The district court found the appropriate Guideline offense level was thirteen (twelve- to eighteen-months imprisonment). Level thirteen falls in Zone D of the sentencing table, meaning halfway house or home confinement cannot be substituted for any portion of a term of imprisonment. U.S.S.G. § 5C1.1(f). Thus, to impose a sentence of halfway house and home detention, the district court effectively varied downward three offense levels, to level ten (six- to twelve-months imprisonment), which falls in Zone B of the sentencing table. Under Zone B *all* of the term of imprisonment may be substituted for a sentence of probation[3] that includes an equal amount of halfway house or home confinement. U.S.S.G. § 5C1.1(c)(3), (e). A slightly different way to look at the variance would be to view the district court as having moved the Zone B overlay upward three levels to include offense level thirteen.[4]

---

[3]The district court actually imposed a sentence of *supervised release*—as opposed to probation—which included three months of halfway house confinement and nine months of home detention. While not raised by the parties, the Guidelines state a Zone B sentence of *supervised release* (versus probation) can include home detention "provided that at least one month" of the sentence is "satisfied by imprisonment." Here, Chettiar was not sentenced to at least one month in prison. The United States does not contest this application of the Guidelines, however, and we do not address the matter.

[4]This is a more accurate description of the variance. The maximum sentence under offense level ten is twelve months. The district court actually imposed a sentence of twelve months of non-prison confinement as a substitute for prison confinement *plus* one day time served pretrial. Therefore, the district court applied the substitution options available in Zone B to a level thirteen offense by shifting the sentencing table's Zone B overlay upward three levels. Similar zone shifts have been implicitly affirmed by this court. For example, in United States v. Hadash, 408 F.3d

The Government argues, however, the court should view the district court as having imposed only 1 day of the 365 day (twelve month) minimum level thirteen prison sentence, resulting in a variance of 364/365ths or a 99.73% deviation from the minimum advisory sentence. When considering what constitutes an extraordinary or dramatic variance in other cases, we have calculated (1) the percentage of deviation, (2) the number of offense levels shifted (up or down) from the Guidelines level to arrive at the sentence imposed, and (3) both the percentage and level variance. In United States v. Maloney, we stated: "The offense-level approach seems more in keeping with our assigned role to further the objectives of the Sentencing Reform Act, because the guideline system established by the Act was designed to adjust sentences incrementally by offense level, rather than by percentages." 466 F.3d 663, 668 (8th Cir. 2006). While we need not, and do not, decide if one approach is superior in every case, the percentage approach is misleading where the district court varies from a relatively short advisory sentence. Id. at 668 ("[I]t is helpful to bear in mind that a

_____

1080, 1084 (8th Cir. 2005), while discussing the variance there in terms of a six-level downward *departure*, the court actually affirmed pursuant to the § 3553(a) factors. The practical effect was to affirm a six-level shift of Zone A from offense level seven (zero- to six-months imprisonment) to level thirteen (twelve- to eighteen-months imprisonment), which allowed the district court to impose a sentence of four years probation instead of a term of imprisonment). The concept of shifting the sentencing table's zone overlay is even more evident in United States v. Spero, 382 F.3d 803, 805 (8th Cir. 2004), a case decided when the Guidelines were mandatory. In Spero, this court affirmed the district court's imposition of five years probation, six months community confinement, and six months home detention, despite having determined the defendant had committed a level thirteen offense, which mandated a prison sentence. The parties in Spero agreed the district court had departed downward eight levels to offense level five under U.S.S.G. § 5K2.0. But no more than three years probation can be imposed for level five or lower offenses. U.S.S.G. § 5B1.2(a)(2). Therefore, as a practical matter, the district court in Spero shifted the sentencing table's zone overlay upward eight levels, to allow for a sentence other than imprisonment but to also allow for a longer period of probation.

-9-

downward variance of 'fifty percent' is more 'dramatic' within the context of the advisory guideline system when the advisory sentence is 360 months' imprisonment (and the variance amounts to seven offense levels) than when the advisory sentence is eight months (and the variance is only two offense levels)."). But cf. United States v. Ture, 450 F.3d 352, 358 (8th Cir. 2006) (characterizing a variance from a Guideline range of twelve to eighteen months imprisonment downward to two years probation with no confinement as both a 100% variance and a five-level reduction in the defendant's offense level). Finding the logic in Maloney persuasive, we reject the Government's proposed percentage approach to analyzing the variance in this case.

Application of the offense-level approach to the sentencing variance in this case is revealing. As noted above, the district court effectively varied three offense levels, which is not extraordinary or dramatic. See United States v. Saenz, 428 F.3d 1159, 1162 (8th Cir. 2005) ("[W]e are mindful that the Sentencing Commission has concluded that most adjustments for aggravating or mitigating circumstances should be in the amount of two, three, or four offense levels."); see,e.g., United States v. Chase, 451 F.3d 474, 484 (8th Cir. 2006) (affirming a four-level upward variance and deeming the sentence "not extraordinary"); United States v. Red Bird, 450 F.3d 789, 795 (8th Cir. 2006) (affirming on alternative grounds a two-level upward departure stating the sentence was "not the sort of dramatic increase that we have said requires extraordinary reasons before it will be deemed reasonable"); cf. United States v. Wadena, 470 F.3d 735, 740 (8th Cir. 2006) (affirming a nine-level downward variance (a 100% downward variance) from a Guideline range of eighteen to twenty-four months imprisonment down to five years probation based primarily on the ill health of the defendant without any mention of an extraordinary or dramatic justification). As a result of our analysis, we also reject the Government's contention that the variance at issue here was extraordinary.

B

The United States next contends the district court failed to state specific reasons for its sentence in violation of 18 U.S.C. § 3553(c).  We have affirmed sentences despite such challenges where we have found the sentence reasonable after a review of the record.  See United States v. Miller, 484 F.3d 968, 971 ("When the sentencing court fails to state the reasons for the sentence in the written judgment, we affirm if the sentence is reasonable."); United States v. Little Hawk, 449 F.3d 837, 841 (8th Cir. 2006) ("[W]hen the district court fails to provide its reasons as required, we affirm the sentence if we determine that the sentence is reasonable."); United States v. Ademi, 439 F.3d 964, 967 n.2 (8th Cir. 2006) ("[W]here the district court fails to provide its reasons as required, we affirm the sentence if we determine that the sentence is reasonable.").  Moreover, where a district court has failed to comply with the technical requirements of 18 U.S.C. § 3553(c)(2), which require reasons for deviation to be stated in the written order of judgment and commitment, this court has looked to the sentencing transcript and resulting judgment to discern the district court's reasons. See United States v. Kicklighter, 413 F.3d 915, 918 (8th Cir. 2005) (relying on "the sentencing transcript and resulting judgment" where the government challenged the district court's failure to adequately state its reasons in its written order of judgment).

In this case, the district court referenced its reasons for imposing a sentence outside the Guidelines range by identifying portions of § 3553(a) in both Form AO 245B and its seven-page "Statement of Reasons for Imposing Sentence." Additionally, the district court imposed Chettiar's sentence after an evidentiary hearing and after consulting in chambers with a representative of the U.S. Probation Office.  It is also significant that the sentencing hearing transcript shows the district court was aware Chettiar urged a below Guidelines sentence based on his personal history and the nature and circumstances of the offense and that the district court specifically ruled on the admissibility of some of the mitigating evidence at the sentencing hearing.  See, e.g., Rita v. United States, 127 S. Ct. 2456, 2469 (2007) (affirming a within Guideline sentence where "[t]he record ma[de] clear that the

-11-

sentencing judge listened to each argument [for leniency]" and where "[t]he judge considered the supporting evidence"); United States v. Jones, 2007 WL 1976081, at *2 (8th Cir. July 10, 2007) (noting it was significant the record showed the district court heard and acknowledged arguments from both the defendant and the government which addressed the defendant's history and characteristics, his role in the offense, and the need to avoid unwarranted sentencing disparities).

But "we have also stressed that, in the wake of [United States v. Booker, 543 U.S. 220 (2005)], a court maintains a duty to explain its reasons for the sentence imposed with some degree of specificity." United States v. Feemster, 435 F.3d 881, 884 (8th Cir. 2006) (citing United States v. Engler, 422 F.3d 692, 696-97 (8th Cir. 2005)); see 18 U.S.C. § 3553(c)(2) (stating a district court must state in open court "the specific reason for the imposition of a sentence" outside the Guideline range). In this case, the district court expressly stated it found multiple reasons for the variance. At the sentencing hearing, however, the district court only stated one: it stated it was fashioning a sentence to punish Chettiar for exploiting the undocumented workers for his personal benefit but which recognized Chettiar neither sexually nor physically abused those workers. The Government contends Chettiar should not be rewarded merely because he did not commit a further crime against the workers he harbored. While district court later expanded on its reason by noting Chettiar had provided "a good place for [the workers] to live [and had] fed them," we find it impossible given the present record to conduct a meaningful review of whether the district court gave significant weight to any improper or irrelevant factor. Thus, we express no opinion as to whether the sentence imposed is unreasonable and remand the matter for resentencing.

## III

Accordingly, we vacate Chettiar's sentence and remand for resentencing consistent with this opinion.[5] The panel will retain jurisdiction in the event of any further appeal.

_____

---

[5] The district court should expand on its views and give specific reasons for its sentence and may rely on the existing record or conduct a further hearing.