# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2671

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Carlos Ponce, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 13, 2012
Filed: January 17, 2013

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Carlos Ponce of possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The district court[1] sentenced him to 262 months' imprisonment. Ponce appeals, arguing that the court erred in failing to instruct the jury on the lesser included offense of possession of methamphetamine. He also argues that the court imposed an unreasonable sentence. We affirm.

_____

[1] The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

I.

On July 7, 2010, officers of the Lincoln, Nebraska, Police Department stopped a Ford Expedition for a traffic violation. The Expedition was owned and operated by Richard Rivera. The officers knew that Rivera was involved in the use and distribution of methamphetamine.

Ponce was seated in the front passenger seat, and a juvenile female was in the back seat. During the stop, Officer Timothy Cronin searched Rivera's person and found a butterfly knife and $153 cash, including six twenty dollar bills and two ten dollar bills. Officer Jeff Sorensen asked Ponce to step out of the vehicle to arrest him on an unrelated matter. Officer Justin Roach handcuffed Ponce, searched his person, and handed him off to Officer Benjamin Seeman. Roach told Seeman that he had done "a real quick search for weapons," but that Seeman probably should conduct another search before placing Ponce in the patrol car.

Seeman walked Ponce to his patrol car and searched Ponce's person. As Seeman moved to open the car door, he saw Ponce "using his cuffed hands to shake up and down on the back of his jeans." Seeman stepped toward Ponce and noticed a cloth sunglass case near Ponce's left foot. Seeman asked Ponce where the case came from, and Ponce became "very agitated," denied ownership of the case, and claimed that Seeman could not prove it was Ponce's case. Sorensen heard the commotion, and saw the case on the ground, inches from Ponce's left shoe. Inside the case, Sorensen found a clear plastic bag of a "crystalized substance" and a glass pipe with white residue on it. Subsequent testing showed that the plastic bag contained 28.28 grams—approximately one ounce—of methamphetamine, with a purity level greater than ninety-five percent. The pipe tested positive for methamphetamine residue.

Officers then searched the Expedition. In a pocket on the back of the driver's seat, Sorensen found a "plastic ashtray holder" containing $860 cash in ten and twenty

dollar bills.  Roach found a small black cup with suspected methamphetamine residue near the center console.  Inside the center console, Cronin found a digital scale, which later tested positive for methamphetamine and cocaine residue.

A grand jury charged Ponce with possession with intent to distribute five grams or more of methamphetamine.  Ponce pleaded not guilty and proceeded to trial.

At trial, Sergeant William Koepke of the Lincoln/Lancaster County Drug Unit testified as an expert regarding the use and distribution of methamphetamine in the Lincoln area.  Koepke had been employed with the Lincoln Police Department for nineteen years, and spent more than ten years in the Department's narcotics unit.  In the narcotics unit, Koepke had interviewed drug traffickers, reviewed reports of other officers, conducted proffer interviews, and performed surveillance of controlled buys of narcotics.  He estimated that he had interviewed more than 1,000 people involved with narcotics and participated in the execution of over 250 narcotics-related search warrants.  Koepke had attended training seminars regarding narcotics investigation and was a certified instructor on drug investigations.

Koepke testified at trial that individuals selling drugs may work in teams.  A driver, for example, may be enlisted to drive the seller around to distribute the drugs at different locations.  The carrying of weapons is associated with drug dealing, because a dealer needs to protect his product and proceeds.  According to Koepke, the knife found on Rivera was consistent with this practice.

Koepke testified that drug dealers prefer to make transactions in cash, and that dealers commonly carry large amounts of currency representing the proceeds of their sales.  According to Koepke, the currency found in the vehicle and on Rivera's person—largely made up of ten and twenty dollar bills—was consistent with his experience in narcotics investigations.  Koepke testified that larger denominations may be present in cases involving "extremely large quantities of money," or pounds

of methamphetamine, but that the lower denominations are more typical "when you're talking about an ounce" of methamphetamine. In Koepke's experience, dealers try to find ways to conceal money or drugs, and the use of the ashtray canister to conceal the $860 found in the vehicle is consistent with this practice.

Koepke testified that dealers commonly use scales to weigh drug quantities for distribution, and that the digital scale found in the Expedition was similar to scales he had encountered in drug investigations. Koepke testified that he had never encountered a mere drug user who carried a large quantity of money with drugs, weapons, and a scale.

Koepke also testified regarding the typical usage quantities of methamphetamine. A first time user might use less than a quarter gram at a time, while a person "abusing quite frequently" can use up to a "teener," or 1.75 grams, each time. Based on Koepke's experience, a "teener" is on the "higher end" of what a person might use in one dose, and the amount used tends to drop as the purity level of the methamphetamine increases.

Koepke testified that he was familiar with the methamphetamine market in the Lincoln area. In July 2010, an ounce of "very pure" methamphetamine would cost between $1,000 and $2,300, though prices on the higher end of that range were more common. Koepke testified that methamphetamine costs more as its purity level increases. Koepke testified that he had "never in my talking to people that have used drugs, who have sold drugs, had someone tell me that they have purchased an ounce of methamphetamine for their personal use." Rather, in Koepke's experience, a person buying an ounce is "breaking it down" to smaller quantities for distribution.

At the close of the evidence, Ponce requested that the court instruct the jury on the lesser included offense of possession of methamphetamine. The district court denied the request, concluding that there was insufficient evidence to support a simple

possession instruction. The jury convicted Ponce, and the district court sentenced him to 262 months' imprisonment.

## II.

On appeal, Ponce argues that the district court erred in denying his request for a simple possession instruction. He also contends that his sentence is unreasonable.

## A.

"[T]he defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973). Our cases say that the instruction is warranted where "the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense." *United States v. Gentry*, 555 F.3d 659, 667 (8th Cir. 2009). We review a district court's refusal to give the instruction for abuse of discretion. *United States v. Santoyo-Torres*, 518 F.3d 620, 624 (8th Cir. 2008).

In this case, the element differentiating the greater and lesser offenses is the intent to distribute methamphetamine. As such, the dispositive question is whether a trier of fact rationally could have found that Ponce possessed the methamphetamine entirely for personal use, without an intent to distribute. *See Gentry*, 553 F.3d at 667-68. After a careful review of the record, we conclude that the district court properly denied Ponce's requested instruction.

We begin with the evidence found on Rivera and in the Expedition: a butterfly knife, over $1,000 in cash (made up largely of ten and twenty dollar bills), and a scale containing methamphetamine and cocaine residue. Koepke testified that each of these

items is consistent with drug distribution. Ponce's possession of 28.28 grams of ninety-five percent pure methamphetamine, while riding in a vehicle containing a scale, knife, and cash, goes a long way toward showing that if he possessed the drugs, then he did so with intent to distribute them. *See generally United States v. Lopez*, 42 F.3d 463, 467 (8th Cir. 1994) (intent to distribute may be established by drug quantity and purity, and the presence of firearms, cash, packaging material, or other distribution paraphernalia).

We relied on the presence of similar items—a scale, cash, and money order receipts—to affirm the denial of a lesser included instruction in *Santoyo-Torres*. *See* 518 F.3d at 624. Ponce asserts that *Santoyo-Torres* is "patently distinguishable," because the indicia of distribution in that case were found on the defendant's person and in a vehicle in which he was the sole occupant, *id.* at 622, while the items in this case were found on Rivera—a known methamphetamine user and distributor—or concealed within Rivera's vehicle. Koepke testified, however, that dealers often work in teams, with some members providing transportation or protection to the party making the sales. He also testified that the amount of methamphetamine found near Ponce was a distribution quantity, and no other drugs were found in the vehicle except for residual amounts of methamphetamine and cocaine on the scale. Given Ponce's possession of the only distribution quantity of drugs, and the presence of other hallmarks of distribution in the vehicle, the evidence strongly suggests Ponce and Rivera were engaged jointly in the distribution of methamphetamine.

But perhaps, Ponce suggests, he was merely "taking a drive with his drug dealer," Richard Rivera, and the methamphetamine was for Ponce's personal use. We agree with the district court that the suggested inference is not reasonable. Koepke testified that an ounce of methamphetamine could be purchased in Lincoln for $1,000-$2,300 in July 2010, with prices on the higher end more common. "The higher the purity," Koepke explained, "the more the methamphetamine costs." Ponce possessed nearly an ounce of ninety-five percent pure methamphetamine, and the only cash in

the vehicle amounted to $1013—found in Rivera's pocket ($153) and an ashtray holder ($860). It strains credulity to suppose that Rivera sold an ounce of high purity methamphetamine for a bargain basement price, promptly divided that cash between his pocket and an ashtray holder, and then exposed himself to prosecution by gratuitously "taking a drive" with the drug customer who possessed the contraband that Rivera just distributed.

The quantity of drugs involved also supports the district court's decision to reject the simple possession instruction. Ponce maintains that the amount was reasonable for personal use, because the trial testimony established that a methamphetamine user "could possibly" use one-eighth of an ounce per day, and that the quantity here would last such a person about eight days. To be sure, Koepke acknowledged, when questioned about methamphetamine users "on the extreme side," that "[t]here have been reports" of users consuming an "eightball" (approximately 3.5 grams) per day, and he deemed it a "possibility" for someone to use an eightball over a weekend. Based on his experience, however, Koepke explained that a person "abusing quite frequently" can use "up to" a "teener," or 1.75 grams, at a time. He also explained that the amount used decreases as the drug purity increases, and the methamphetamine found near Ponce was greater than ninety-five percent pure. This evidence would not permit a rational jury to find that the methamphetamine in this case was simply Ponce's eight-day personal supply.

In a related argument, Ponce contends that a methamphetamine user could achieve significant savings by buying in bulk—as though he were buying "a bunch of rolls of toilet paper" at "Sam's Club"—while at the same time limiting his exposure to surveillance by reducing the number of purchases. Koepke testified, for example, that an individual eightball might cost as much as $400. So acquiring an ounce by buying four separate eightballs could cost $3,200, the argument goes, whereas buying the entire ounce all at once might cost half as much. The problem with Ponce's argument is that there was no evidence that methamphetamine users purchase the drug

in this way. To the contrary, Koepke testified that in his career he had *never* encountered a person who claimed to have purchased or possessed an ounce of methamphetamine solely for personal use. *See Santoyo-Torres*, 518 F.3d at 624 (affirming denial of a simple possession instruction where an expert testified that "he had never seen someone possess 138.5 grams or more of methamphetamine for personal use"). According to Koepke, a person buying an ounce is "breaking it down" for resale. He testified that even lesser quantities, including a quarter-ounce, an eighth ounce, and possibly even a sixteenth of an ounce, are acquired for resale. Koepke's acknowledgment that a hypothetical user *could* save money by buying an entire ounce at one time, without any evidence to suggest that users purchase the drug in this manner exclusively for personal use, is insufficient to support a rational finding that Ponce possessed the methamphetamine without intent to distribute.

Finally, Ponce notes that the methamphetamine in this case was found with a pipe, suggesting that he is a user of the drug. While the lack of a pipe might have made the intent to distribute more clear, *cf. Santoyo-Torres*, 518 F.3d at 622; *United States v. Jones*, 586 F.3d 573, 575 (8th Cir. 2009), we have rejected the notion that evidence of personal use requires a simple possession instruction, recognizing instead that "many drug dealers themselves may sometimes use the products they distribute and sell." *United States v. Romero*, 856 F.2d 1020, 1024 (8th Cir. 1988). In fact, Koepke testified that it is "[q]uite common" for users to also be dealers. Although *Romero* involved a "pattern of selling," 856 F.2d at 1024, we have affirmed the denial of a simple possession instruction even where there was "no direct or physical evidence of actual or contemplated distribution." *United States v. Short*, 805 F.2d 335, 336 (8th Cir. 1986). The circumstantial evidence of distribution here—including drug quantity, drug purity, and tools of the trade in the vehicle—is sufficiently compelling to preclude a rational finding that Ponce possessed the drugs merely for personal use. The district court thus properly rejected Ponce's requested instruction.

B.

Ponce next challenges his sentence as substantively unreasonable. Due to prior felony convictions for attempted robbery and operating a motor vehicle to avoid arrest, the district court determined that Ponce was a career offender under USSG § 4B1.1. Application of the career-offender guideline resulted in an advisory guideline sentencing range of 262 to 327 months' imprisonment. The district court sentenced Ponce at the bottom of this range. We review the reasonableness of the district court's sentence under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007).

Ponce does not dispute the application of the career-offender guideline. He argues, however, that the district court should have rejected the guideline due to Ponce's age at the time of the predicate offenses, the "extenuating facts" surrounding those crimes, and disparity between Ponce's 262-month sentence and his sentences for prior crimes.

Ponce urged all of these points on the district court, but the court found that a variance was not warranted. The court noted that Ponce's criminal history, which the court "charitabl[y]" described as "horrible," began at the age of thirteen and reflected a "trajectory . . . that suggests that the public needs to be protected from him for a significant period of time." The court acknowledged Ponce's relatively young age, and that he may be able to "turn his life around," but after considering the statutory sentencing factors, *see* 18 U.S.C. § 3553(a), the court determined that a sentence within the advisory guideline range was appropriate. At least with respect to age, the court's refusal to vary was consistent with the advice of the Sentencing Commission that "[a]ge (including youth) is not ordinarily relevant in determining whether a departure is warranted." USSG § 5H1.1; *see United States v. Maloney*, 466 F.3d 663, 669 (8th Cir. 2006). A sentence within the recommended guideline range is presumed reasonable, and the district court acted within its broad discretion in rejecting Ponce's

arguments for a lighter sentence. *See United States v. Jordan*, 573 F.3d 586, 590 (8th Cir. 2009) (per curiam).

\* \* \*

The judgment of the district court is affirmed.

_____